**EXHIBIT "1"**

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3
    SHANE HORTON, by his guardian    )
 4  ad litem, YVONNE HORTON,         )    CERTIFIED COPY
                                     )
 5          Plaintiff,               )
                                     )
 6      vs.                          ) Case No.:
                                     ) 2:14-CV-06135
 7  CITY OF SANTA MARIA; SANTA MARIA ) SJO (PJWx)
    POLICE DEPARTMENT; MARC SCHNEIDER;)
 8  ANDREW BRICE; JEFFREY LOPEZ; ELIGIO)
    LARA; DAVID CULVER; and DOES 1-10,)
 9  INCLUSIVE,                       )
                                     )
10          Defendants.              )
    _____)
11

12

13

14

15       TELEPHONIC DEPOSITION OF EXPERT WITNESS

16                      ROGER CLARK

17           MONDAY, MARCH 30, 2020, 10:01 A.M.

18

19

20

21

22       Reported by Debra D. Smalley, CSR No. 8513
                    CLS Job No. 123507
23

24             CENTEXTLEGAL.COM - 855.CENTEXT

25
```

```
 1  are home, and I don't know how quick I could find it.
 2          MR. PRAET:  Okay.
 3          MR. LIRA:  I don't know if Mack could.
 4          MR. PRAET:  How about if Roger gets it to one
 5  of you, and then you get it to me.
 6          MR. LIRA:  Yeah.
 7          MR. STATON:  I'll work on it also, Bruce.
 8  BY MR. PRAET:
 9      Q   All right.  Mr. Clark, what's your hourly rate
10  in this case?
11      A   $250 an hour for review and the report and
12  $350 an hour for testimony.
13      Q   How much have you billed so far?
14      A   I billed $3500, which was paid back in -- given
15  to me in 2015.
16      Q   Okay.  And how much more have you billed in the
17  case or do you intend to bill in the case?
18      A   I probably will bill for five to -- around five
19  to ten hours after the deposition.  The deposition prep
20  and so forth.  But other than that, I don't anticipate
21  billing anything.
22      Q   Are you still handling about a hundred cases a
23  year?
24      A   Yes.
25      Q   And those are all for attorneys suing law
```

ROGER CLARK                                                              March 30, 2020

```
 1   enforcement; right?
 2        A    Well, there's quite a few this year of defense
 3   in criminal matters I've done for public defenders and
 4   such.  Other than that, they are mainly for the
 5   plaintiff.
 6        Q    Okay.  Let me see if I can do that again, then.
 7             Are you still handling about a hundred civil
 8   cases a year?
 9        A    No.  I think probably 80.  Well, 75 this year.
10   Or a year.  25 criminal issues for -- pro bono for public
11   defenders throughout the nation.
12        Q    So of all of civil cases that you're handling
13   this year, are they all on behalf of attorneys suing
14   law enforcement?
15        A    As I remember, so far this year, yes.
16        Q    And all the criminal cases you're doing are
17   on behalf of the criminal defendant; is that right?
18        A    Yes.
19        Q    Would it be fair to say that one hundred percent
20   of your income this year as an expert witness is coming
21   from attorneys who are suing the police?
22        A    Yes.  Excluding the expenses.  Sometimes I ask
23   for expenses from public defender offices, but that's it.
24   Yeah, I would agree.
25        Q    And I know it's been over 25 years since you
```

```
 1      A      I was.
 2      Q      Did you have any specific training as a deputy
 3   with respect to an operating facility with -- a temporary
 4   holding facility, let's say?
 5      A      I was partnered with the jailer, and I worked
 6   under the direct supervision of the watch sergeant and
 7   the watch lieutenant when I had that assignment.
 8      Q      Is that the equivalent of an FTO program?
 9      A      They had no -- they didn't have that
10   nomenclature, but that would be it.
11      Q      So basically on-the-job training?
12      A      Well, substantial, but it was on the job, yes.
13      Q      Did you have any specific courses, POST or
14   otherwise, with respect to acting as a deputy in the
15   jail?
16      A      In the academy, the POST training included a
17   learning domain on custody, and that was when I attended
18   the academy class 110, which is a POST-certified academy.
19      Q      Okay.  Anything else?
20      A      Well, when I graduated from the academy, I went
21   directly into custody, and I was involved in an extensive
22   training program as part of my assignment in the Men's
23   Central Jail.
24      Q      That would be the on-the-job training you talked
25   about; right?
```

```
 1  someone.
 2      Q    Let's stick with bullet point number 5.  I'm
 3  not jumping ahead.
 4           You indicate in your report that Shane expressed
 5  anxiety and depression before being placed alone in the
 6  cell.
 7           How did he indicate depression before being
 8  placed in the cell?
 9      A    That has to do with the conversation he had
10  before he was left alone in that cell.
11      Q    So do you want to change your report to being
12  left alone or being placed in a cell?
13      A    I think you left out an important word.  Placed
14  alone in the cell.  I don't feel it's necessary to make
15  any adjustments to that bullet point.
16      Q    All right.  You talk, at bullet point number 6,
17  about the phone conversation between Shane's mother and
18  Officer Brice.
19           Why do you have that under uncontested facts?
20      A    It's an uncontested fact that she made the call.
21  That that call occurred.  We have admissions on both --
22  by both parties.  It's referenced directly on page --
23      Q    Let me stop you for a second, Roger.
24      A    Well, do you want me --
25      Q    Well, wait.
```

```
 1    PCP subjects into the jail and helped write that
 2    protocol.
 3         Q    There's no evidence that Shane was having any
 4    flashbacks while he was in that cell on December 29th,
 5    was there?
 6         A    I don't know.  I wasn't there.
 7         Q    Is there any evidence in the record that you
 8    saw?
 9         A    There's nothing in the written documents about
10    that.
11         Q    Or the video?
12         A    You couldn't tell by the video one way or the
13    other.
14         Q    Okay.  In your last paragraph on page 5, you
15    talk about some of the problems that Shane was telling
16    Schneider about.
17              Is there some reason you don't mention all
18    the positive things that Shane was telling him about?
19         A    I focused on all of the obvious indicators
20    that he was having a lot of problems, and he was anxious,
21    depressed and distraught.  That was the focus of that
22    paragraph.
23         Q    Given -- I mean, the officer should be looking
24    at the totality of the circumstances; right?
25         A    Yes.
```

1    Q    Is that "yes"?
2    A    Yes.
3         And that's exactly what I've been talking about.
4    The totality of the circumstance. And the scales tip
5    way, way in favor of this is really a problem inmate,
6    and I've got to get him to the right --
7    Q    If the standard is the totality of the
8    circumstances, why did you not include all the positive
9    things that Shane talked about?
10   A    Because as I think I answered it, I focused on
11   the obvious indicators to Schneider of a deeply-troubled
12   inmate that demonstrated suicidal ideation.
13   Q    Should the officer ignore Shane's discussions
14   about all the positive things going on in his life and
15   his future plans?
16   A    I wouldn't fault Schneider for listening to
17   that. But that certainly would not outweigh the
18   significant indicators of what Shane was going through.
19   Q    And that's based on your expertise in what?
20   A    Well, 27 and a half years of being a law
21   enforcement officer and dealing with a lot of people
22   that are emotionally distraught.
23   Q    Okay. We're talking in this case about
24   evaluating an arrestee; right?
25   A    That's the focus of my comments about Schneider,

```
 1   yes.
 2         Q     And it's your opinion that just the negative
 3   things that Shane talked about should tell a police
 4   officers that Shane was suicidal?
 5         A     Well, certainly in this case, yes.
 6         Q     And I'm just trying to get the foundation for
 7   your opinion.
 8               That includes your two years as a deputy sheriff
 9   in the jail; right?
10         A     It includes that, yes.
11         Q     And you had a junior college course on psych;
12   right?
13         A     That's also true.
14         Q     And is there anything else that qualifies you
15   to evaluate whether someone is suicidal?
16         A     All the experiences in the Men's Central Jail,
17   both as a line officer and as a commander.  All my
18   experiences in the field.  In particular, with very
19   desperate individuals and the ability to evaluate
20   their state of mind, which is reflected in the record.
21   Unmatched record, incidentally.  Those things.
22               MR. PRAET:  All right.  I probably have another
23   45 minutes.  Does anybody want to take a break?
24               How are you doing, Madam Court Reporter?
25               COURT REPORTER:  I'm fine.
```

1   "This misstatement in Officer Brice's report creates a
2   distrust of the accuracy of the entire report."
3            Number one, let me ask you this. Where is the
4   misstatement?
5       A    He did not advise him of his Miranda Rights.
6   He simply said "You remember your rights; right?"
7       Q    And he never put in his report that he advised
8   him, "and I went over his rights again," didn't he?
9       A    He claims he gave him his Miranda Rights in
10  the report.
11      Q    Where?
12      A    I don't have his report in front of me, but
13  that's the way I read his report.
14      Q    You don't intend to offer an opinion with
15  respect to credibility of any of the officers, do you?
16      A    Well, as you know, that's in the second
17  paragraph of my Rule 26 report.
18      Q    But you can't offer credibility assessments;
19  correct?
20      A    I don't do that. I consider that the jury's
21  job and -- (phone cutting out) -- to make that
22  determination.
23           COURT REPORTER: I didn't hear the end of that.
24  You're breaking up.
25           THE WITNESS: I think there might be something

1  here.
2         In the 9th Circuit opinion, it states "Officer
3  Brice's conversation with Horton's mother lasted for
4  approximately ten to fifteen minutes. In the first
5  minutes of that conversation -- the first few minutes --
6  Horton removed the belt he was wearing, strung it
7  through the cell door bars, looped it around his neck,
8  and slumped down. Approximately eight minutes before
9  the phone call ended, Horton was no longer seen moving."
10        So that's the best that can be done there,
11 and I agree with that assessment. That's what I took.
12    Q    Okay. And I know you keep citing to the 9th
13 Circuit opinion, but you're not taking that as factual
14 evidence, are you?
15    A    Oh, absolutely. I took it as factual evidence
16 because that's what they did. That's an expression of
17 their factual evidence.
18    Q    Okay. Well, I'm sure the lawyers will agree
19 that we're not going to be offering the 9th Circuit
20 opinion into evidence. I'd ask you to limit yourself
21 to the actual evidence in this case.
22        So let me ask you, from your review of the
23 evidence in the case in the record, would you agree
24 that Shane hanged himself within 90 seconds after his
25 mother refused to post bail?

```
 1   this could not be interpreted as simply sitting against
 2   the cell door awaiting transportation.
 3       Q   Okay.  And once again, I'm going to ask you for
 4   an answer to the question.
 5           Did the image that you saw, the physical aspects
 6   of the image, show anything other than Shane sitting on
 7   the floor leaning against the bars?
 8       A   So you've taken out the motive.
 9           It shows Shane in that seated position against
10   the bars.  I would agree to that.
11       Q   All right.  As soon as Shane was discovered,
12   you agree that Brice and others immediately began CPR
13   with the AED and ordered medics?
14       A   Yes, when he was finally discovered.  Yes.
15       Q   Okay.  Let's get to your opinions, which
16   shouldn't take long since we've been through most of
17   your foundation.
18           On page 7, you start by using the phrase
19   "deliberate indifference to the rights of mentally
20   ill and suicidal arrestees."
21           You don't intend to offer an opinion with
22   respect to the standard by which the defendants will
23   be judged, do you?
24       A   No.  I believe that's a jury instruction.
25       Q   Okay.  So you're not going to say whether it
```

1  amounted to deliberate indifference or not in your
2  opinion; right?
3       A    According to my understanding of deliberate
4  indifference, if I'm allowed to answer that I would,
5  and I would say that it is, if I was asked and allowed
6  to answer it.
7       Q    All right. We'll make sure the judge doesn't
8  allow you to offer that, but anyway --
9            Is there any evidence available to these
10 officers that Shane was mentally ill or suicidal two
11 weeks prior when he put out cigarettes on his face?
12      A    Well, I think that was -- was that evidence
13 of suicidal? Yes, it was. Self-destructive behavior.
14      Q    So you, Roger Clark, disagree with the medical
15 professionals that came to the conclusion it was not
16 suicidal?
17      A    Well --
18           MR. LIRA: Let me object. It's ambiguous and
19 lacks foundation.
20           THE WITNESS: I'm trying to plow through the
21 ambiguity. And I believe it was -- from the officer's
22 perspective that booked him in -- or actually took him
23 into custody, based on the authority of 5150 and not
24 drug addiction, was correct. The eventual diagnosis I
25 can't comment on because I don't know that record. I

1 of the community at large by depriving an individual of
2 freedom is one of great importance to American democracy.
3 Misuse of this authority undermines the relationship
4 between law enforcement and the community and undermines
5 our fundamental belief in a democratic government. The
6 actions of an officer who takes someone into custody must
7 always be accomplished using an agency's policy and
8 commitment to unbiased policing. We must ensure that
9 our enforcement activities are applied fairly and
10 equitably throughout our communities."
11     Then it continues. "Peace officers who have
12 responsibility for arrested persons are liable for the
13 safekeeping and standard of care of those persons.
14     "Failure to uphold the expected level of care
15 under the provisions of state and federal laws or the
16 callous disregard" -- which is bolded and underlined --
17 "for an arrested person's safety will subject peace
18 officers to," and it gives a number of sanctions.
19     Q    Does it say anything about suicidal subjects
20 or 5150s?
21     A    POST covers suicidal ideation, and it also is
22 implicit in what I just read you in the introductory
23 statements of the custody officer's responsibilities
24 and the interpretation of callous disregard, and I'll
25 leave it at that.

```
 1   assessing Officer Brice's conduct based on even false
 2   information provided to him?
 3       A    Based on what?
 4       Q    False information.  In other words -- let me
 5   ask you a different way.
 6            If Officer Brice was given false information,
 7   should he rely on it?
 8       A    If he knew it was false he shouldn't.  If he
 9   didn't know it was false he would.
10       Q    You mention, at the last line of opinion number
11   6, "rising to the level of callous disregard (as taught
12   by POST)."
13            Is that that kind of overview paragraph you
14   read for us?
15       A    Right.
16            So I defined callous -- well, I define where
17   the callous disregard appears in POST learning domain 31
18   in the opinion 7.
19       Q    And just like deliberate indifference, unless
20   the court allows you to, you're not going to offer
21   opinions with respect to callous disregard, are you?
22       A    No.  I only comment on what I'm allowed to in
23   trial.
24       Q    Was it callous for Officer Brice to initially
25   plan to cite and release Shane on the initial charge?
```